**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-1740**

───────────────

AMERICAN ENERGY, LLC,

       Petitioner,

    v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; CANDITA GOODE, o/b/o The Estate of Bruce E. Goode,

       Respondents.

───────────────

On Petition for Review of an Order of the Benefits Review Board (20–0021–BLA)

───────────────

Argued: December 6, 2023                   Decided: July 1, 2024

───────────────

Before RICHARDSON, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

───────────────

Petition for review granted; order vacated and remanded by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Richardson joined. Judge Benjamin wrote a dissenting opinion.

───────────────

John R. Sigmond, PENN, STUART & ESKRIDGE, Bristol, Tennessee, for Petitioner. Brad Anthony Austin, WOLFE WILLIAMS & REYNOLDS, Norton, Virginia, for Respondents.

───────────────

QUATTLEBAUM, Circuit Judge:

American Energy petitions for review of the Benefits Review Board's award of black lung benefits to the surviving wife of the late Bruce E. Goode. Mr. Goode worked for American Energy as a coal miner and suffered from a severe chronic obstructive pulmonary disability. Because Mr. Goode was a long-time cigarette smoker, American Energy disputed the cause of his impairment. After weighing competing medical opinions, an administrative law judge found that Mr. Goode's totally disabling chronic obstructive pulmonary condition arose from his coal mine employment and, thus, awarded black lung benefits based on findings of legal pneumoconiosis and clinical pneumoconiosis. On appeal, the Board affirmed the award based on the ALJ's legal pneumoconiosis findings only.

American Energy petitions for our review of the Board's decision, arguing that the ALJ applied an incorrect legal standard. American Energy insists that the Black Lung Benefits Act and its implementing regulations require a miner to prove that coal dust caused Mr. Goode's lung disease or made it worse. But it contends that the ALJ flipped the burden of proof by finding that American Energy had not proven why Mr. Goode's lung disease was not at least partially due to coal dust exposure.

We agree that the ALJ applied the wrong legal standard in determining that Mr. Goode had legal pneumoconiosis. However, the ALJ also concluded that Mr. Goode's clinical pneumoconiosis entitled him to benefits. Though that determination is supported by substantial evidence and is in accordance with the law, our precedent precludes us from

2

affirming on this alternative basis that the Board did not reach. We, therefore, grant American Energy's petition and vacate and remand the Board's order.

## I.

The Black Lung Benefits Act, 30 U.S.C. §§ 901–945, aims "to provide benefits . . . to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease." *Id.* § 901(a). Colloquially known as black lung disease, pneumoconiosis is defined by the Act as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." *Id.* § 902(b).

The Act does not clarify what it means to be "totally disabled due to pneumoconiosis." *See id.* § 901(a). Rather, it directs the Secretary of the Department of Labor to "prescribe standards for determining . . . whether a miner is totally disabled due to pneumoconiosis." *Id.* § 921(b). Still, the Act provides a rebuttable presumption of total disability due to pneumoconiosis in certain circumstances. *See id.* § 921(c). For instance, a miner is entitled to such a rebuttal presumption if, among other things, he worked in underground coal mines for at least 15 years. *See id.* § 921(c)(4). Where that presumption is not rebutted, a miner is entitled to black lung benefits.

But where, as here, a miner is not afforded that presumption because he did not work in underground coal mines for at least 15 years, the Act's implementing regulations require a miner seeking black lung benefits to prove four elements. The miner must prove "(1) that he has pneumoconiosis, in either its 'clinical' or 'legal' form; (2) that the pneumoconiosis

3

arose out of coal mine employment; (3) that he is totally disabled by a pulmonary or respiratory impairment; and (4) that his pneumoconiosis is a substantially contributing cause of his total disability." *Mingo Logan Coal Co. v. Owens*, 724 F.3d 550, 555 (4th Cir. 2013); *see also* 20 C.F.R. §§ 718.202, 718.203, 718.204(c), 725.202(d). A miner must prove each of these elements by a preponderance of the evidence. *See* 30 U.S.C. § 932(a) (incorporating 33 U.S.C. § 919(d) (the Longshore and Harbor Workers' Compensation Act), which incorporates 5 U.S.C. § 554 (the Administrative Procedure Act), which incorporates 5 U.S.C. § 556(d)); *Dir., OWCP v. Greenwich Collieries*, 512 U.S. 267, 270–71 (1994); *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 207 (4th Cir. 2000).

As to the first element, pneumoconiosis can take two forms—clinical and legal. *See Clinchfield Coal Co. v. Fuller*, 180 F.3d 622, 625 (4th Cir. 1999); *Hobbs v. Clinchfield Coal Co.*, 45 F.3d 819, 821 (4th Cir. 1995). The regulations define clinical pneumoconiosis, in relevant part, as "those diseases recognized by the medical community as pneumoconiosis, i.e., the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to the deposition caused by dust exposure in coal mine employment." 20 C.F.R. § 718.201(a)(1). So, clinical pneumoconiosis looks for the presence of particles in the lungs and the lungs' reaction to those particles. Among other types, clinical pneumoconiosis may take the form of silicosis, a condition resulting from the inhalation and deposition in the lungs of silica dust found in coal rock. *See id.* While clinical pneumoconiosis can, at times, be shown through x-rays, it can be difficult to prove, especially when a miner is still alive.

4

The regulations, however, provide an alternative way of establishing pneumoconiosis—legal pneumoconiosis. They define legal pneumoconiosis as "any chronic lung disease or impairment and its sequelae arising out of coal mine employment," which includes "any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." *Id.* § 718.201(a)(2). Legal pneumoconiosis does not require evidence of particles in the miner's lungs, but the miner must still show that his lung disease (such as chronic obstructive pulmonary disease, or "COPD") arose out of coal mine employment. To arise out of coal mine employment means to be "significantly related to, or substantially aggravated by," coal dust exposure in coal mine employment. *See id.* § 718.201(b).

To establish the second element of a black lung benefits claim, a miner must prove that his pneumoconiosis "arose at least in part of coal mine employment." *See id.* § 718.203. A miner who satisfies the first element of his claim by establishing legal pneumoconiosis necessarily satisfies this second element; by definition, legal pneumoconiosis arises out of coal mine employment. But a miner who establishes clinical—and not legal—pneumoconiosis at the first step must, at the second step, prove that his clinical pneumoconiosis is "significantly related to, or substantially aggravated by," coal dust exposure in coal mine employment. *See id.* §§ 718.201(b), 718.203(a).

The third element requires a showing of a totally disabling respiratory or pulmonary impairment. *See id.* § 718.204. Under the regulations, a miner is considered totally disabled by his respiratory or pulmonary impairment if that impairment prevents him (i) from performing his usual coal mine work and (ii) from engaging in gainful employment that requires skills or abilities comparable to those used in his prior coal mine employment. *See*

5

*id.* § 718.204(b)(1).

And for purposes of the fourth element, pneumoconiosis is a "substantially contributing cause" of a miner's total disability if it "[h]as a material adverse effect on the miner's respiratory or pulmonary condition" or if it "[m]aterially worsens a totally disabling respiratory or pulmonary impairment which is caused by a disease or exposure unrelated to coal mine employment." *Id.* § 718.204(c)(1). As with the second element, proving causation may vary depending on whether the miner claims clinical or legal pneumoconiosis. If a miner claims clinical pneumoconiosis arising out of coal mine employment at the first and second steps and a total disability at the third step, the fourth step requires him to link that total disability to his clinical pneumoconiosis arising out of coal mine employment.

But a miner's establishment of legal pneumoconiosis may, at times, satisfy not only the first and second elements of his claim, but also this fourth element because the definition of legal pneumoconiosis expressly encompasses certain conditions arising out of coal mine employment that can be totally disabling, such as COPD. For instance, at least two of our sister circuits have held that if a miner's legal pneumoconiosis *is* his total disability, separately analyzing disability causation is unnecessary. *See, e.g.*, *Energy W. Min. Co. v. Dir., OWCP*, 49 F.4th 1362, 1369 (10th Cir. 2022) ("Because [the miner]'s COPD was totally disabling and constituted legal pneumoconiosis, the Board correctly found that [the miner] had established 'disability causation.'"); *Island Creek Ky. Min. v. Ramage*, 737 F.3d 1050, 1062 (6th Cir. 2013) ("Because [the miner] was found to be totally disabled and because all medical experts agreed that [the miner]'s pulmonary problems

6

were a significant cause of his total disability, the only question remaining was whether . . . . [the miner] had legal pneumoconiosis."). We now expressly join those circuits that have reached that holding.

Still, in cases where a miner's legal pneumoconiosis does not double as his totally disabling respiratory or pulmonary impairment, the miner must separately prove that his pneumoconiosis is a substantially contributing cause of that totally disabling respiratory or pulmonary impairment, just as he would if he had proven only clinical pneumoconiosis. For instance, consider a miner with COPD and lung cancer. Assume that substantial evidence supports findings that the miner's COPD arose out of his coal mine employment but that his lung cancer arose only from smoking. That miner must still prove that his pneumoconiosis—in this example, his COPD—and not his lung cancer caused his total disability. *See, e.g.*, *Dehue Coal Co. v. Ballard*, 65 F.3d 1189, 1195–97 (4th Cir. 1995) (finding substantial evidence supported ALJ's finding that miner was totally disabled by lung cancer caused by smoking, not his pneumoconiosis). In such a case, if the record shows that the miner's "cigarette smoking and resulting lung cancer would have disabled him to the same degree by the same time in his life had he never been a miner, he is not entitled to black lung benefits." *Id.* at 1196.

Importantly, the preamble to the implementing regulations provides guidance for the four elements of black lung benefits claims. It addresses the issue presented in this petition—proving the cause of COPD in someone who worked in coal mines and smoked cigarettes. While the preamble acknowledges that coal dust and smoking can both cause lung disease, it states that a history of smoking does not preclude a finding of legal

7

pneumoconiosis. *See* 65 Fed. Reg. 79920, 79940 (Dec. 20, 2000). The preamble also recognizes, however, that coal-dust-induced lung disease and smoking-induced lung disease occur through similar mechanisms, suggesting that the two may be difficult to distinguish based on symptoms alone. *See id.* at 79943.

But the preamble's recognition that a miner with a history of smoking may nevertheless have legal pneumoconiosis does not amount to a presumption. Instead, a miner must prove legal pneumoconiosis, along with total disability and disability causation, by a preponderance of the evidence. *Compton*, 211 F.3d at 207. And as noted above, a miner only proves legal pneumoconiosis by demonstrating that his lung disease or impairment arose out of his coal mine employment, such that it was "significantly related to, or substantially aggravated by," his coal dust exposure in the mines. *See* 20 C.F.R. § 718.201(a)(2), (b). A miner cannot make such a showing by solely relying on evidence equally indicative of coal-dust-induced lung disease and smoking-induced lung disease. That is because a preponderance of the evidence means a showing of "more likely than not." *See U.S. Steel Min. Co. v. Dir., OWCP*, 187 F.3d 384, 389–91 (4th Cir. 1999). If the only evidence a miner presents could equally relate to smoking or coal dust exposure, he has not shown that his lung disease is more likely than not from coal dust. At best, he's presented evidence of a "tie." And while a tie goes to the runner in baseball, it goes to the employer in black lung cases.[1] So, if a miner fails to establish any one of the four elements

---

[1] This principle is not unique to black lung cases. Absent statutory language to the contrary, the party carrying a preponderance of evidence burden loses when the evidence

of his claim by a preponderance of evidence, he has not proven his entitlement to black lung benefits and his claim must be denied.[2]

## II.

With this legal background, we turn to the facts underlying the present petition. In 1979, Bruce E. Goode began working as a coal miner in Virginia for American Energy. In 2005, after working on and off in coal mines for a total of more than 12 years but less than 15 years, 48-year-old Mr. Goode stopped coal mining due to his respiratory problems. Mr. Goode, who also smoked cigarettes for decades, eventually became dependent on prescription oxygen.

Mr. Goode initially sought black lung benefits in 2013. An administrative law judge denied the claim, concluding that Mr. Goode failed to prove that he had pneumoconiosis. However, a miner can request modification of an ALJ's denial of black lung benefits based on "a change in conditions or because of a mistake in a determination of fact." *See* 20 C.F.R. § 725.310. Mr. Goode did this. Unfortunately, he died from respiratory complications before his request for modification could be resolved. But, as permitted by

---

amounts to a tie. *See Cigaran v. Heston*, 159 F.3d 355, 357 (8th Cir. 1998) ("If the evidence that the parties present balances out perfectly, the party bearing the burden loses.").

[2] Our emphasis on the miner's burden of proof is not to question the difficulties of making a living mining coal. As Dwight Yoakam sang, "When the whistle blows each morning / And I walk down in that cold, dark mine / I say a prayer to my dear Savior / Please let me see the sunshine one more time." Dwight Yoakam, Miner's Prayer (Warner Records 1984). But our responsibility is to interpret the Act and its implementing regulations as drafted, not to judicially enlarge them.

the regulations, Mr. Goode's wife, Candita Goode, continued to pursue Mr. Goode's claim. *See id.* § 725.201(a)(2).

Based on findings from Mr. Goode's autopsy—which, of course, were not available before his death—American Energy conceded that Mr. Goode had clinical pneumoconiosis arising out of coal mine employment. American Energy likewise stipulated that Mr. Goode had a totally disabling respiratory or pulmonary impairment. Indeed, each of American Energy's three opining physicians concluded that Mr. Goode had clinical pneumoconiosis and totally disabling COPD.

Perhaps because Mrs. Goode had the potential to satisfy multiple elements of her claim if she proved legal pneumoconiosis at the first step, she argued that Mr. Goode had legal pneumoconiosis, despite the parties' agreement that he had clinical pneumoconiosis.[3] Mrs. Goode based her contention that Mr. Goode had legal pneumoconiosis on the opinions of her four physician expert witnesses, chief among them Dr. Perper's opinion that Mr. Goode's COPD amounted to legal pneumoconiosis. But, because American Energy insisted that there was insufficient evidence to show that Mr. Goode's COPD arose out of his coal mine employment, it disputed the existence of legal pneumoconiosis. And though American Energy acknowledged that Mr. Goode had *clinical* pneumoconiosis arising out of coal mine employment, American Energy argued that Mrs. Goode failed to prove that Mr. Goode's totally disabling respiratory or pulmonary impairment was significantly

---

[3] Though Mrs. Goode was not required to prove that Mr. Goode had legal pneumoconiosis in addition to clinical pneumoconiosis, she nevertheless aimed to prove both forms. And because the Board affirmed the ALJ's award of benefits based on his finding of legal pneumoconiosis, we focus our analysis on that finding.

related to, or substantially aggravated by, that clinical pneumoconiosis. Stated differently, American Energy argued that even if Mr. Goode had coal dust particles in his lungs due to his coal mine employment, his COPD was caused by smoking, not those coal dust particles. Relying on the opinions of its three physician expert witnesses, American Energy argued that Mr. Goode's totally disabling respiratory or pulmonary impairment was, instead, caused by smoking. In other words, American Energy disputed two elements of Mrs. Goode's black lung benefits claim—legal pneumoconiosis and disability causation.

The ALJ granted the request for modification and awarded black lung benefits to Mr. Goode's estate after analyzing the four elements of a black lung benefits claim.

First, in addition to recognizing American Energy's clinical pneumoconiosis concession, the ALJ assessed whether Mrs. Goode established legal pneumoconiosis. In doing so, the ALJ found American Energy's expert physicians' opinions that Mr. Goode did not have legal pneumoconiosis because smoking, not coal dust, caused his respiratory impairment "inconsistent with the Preamble" to the regulations. The ALJ noted that the preamble recognizes that "[a] lengthy smoking history does not preclude a finding that coal dust exposure was a contributing factor to a claimant's pulmonary symptoms" and that "'[s]mokers who mine have additive risk for developing significant obstruction.'" J.A. 125 (quoting 65 Fed. Reg. at 79940). Based on these recognitions, the ALJ concluded that American Energy's physicians failed to adequately explain why Mr. Goode's coal dust exposure was "also not a factor in his obstructive respiratory impairment." J.A. 125.

At the same time, the ALJ credited Mrs. Goode's expert physicians, who opined that both coal dust exposure and smoking caused Mr. Goode's COPD. The ALJ found these

11

opinions "consistent with the Act and regulations" because they recognized the additive effect of coal dust exposure and smoking. J.A. 125. As a result, the ALJ concluded that Mrs. Goode established by a preponderance of the evidence that Mr. Goode had legal pneumoconiosis.

Second, the ALJ concluded that Mrs. Goode established that Mr. Goode's pneumoconiosis arose out of his coal mine employment. This required no additional analysis. The ALJ explained that a finding of legal pneumoconiosis necessarily means that a miner's lung disease arose out of coal mine employment. And recall that American Energy conceded that Mr. Goode's clinical pneumoconiosis arose from his coal dust employment.[4]

Third, the ALJ found that Mrs. Goode established that Mr. Goode had a totally disabling respiratory or pulmonary impairment based on the parties' well-supported stipulation to the same. The ALJ explained that pulmonary function studies, blood gas studies and medical opinion evidence demonstrated that Mr. Goode was totally disabled by a respiratory or pulmonary impairment. The ALJ specifically recognized this impairment as COPD.

Fourth, and finally, the ALJ found that Mrs. Goode established disability causation by demonstrating that Mr. Goode's pneumoconiosis—both clinical and legal—

---

[4] The ALJ also noted that Mrs. Goode was entitled to a rebuttable presumption that Mr. Goode's clinical pneumoconiosis arose out of coal mine employment because he worked in coal mines for over 10 years. *See* 30 U.S.C. § 921(c)(1). Importantly, this presumption only applies in the context of clinical pneumoconiosis. *See* 20 C.F.R. § 718.305(d)(1)(i).

significantly contributed to his totally disabling COPD. However, the ALJ's analysis of this element is not very clear. At times, he seemed to return to the legal pneumoconiosis issue by assessing for a second time whether Mr. Goode's COPD arose out of coal mine employment, as opposed to asking whether Mr. Goode's totally disabling respiratory impairment was significantly related to, or substantially caused by, his legal or clinical pneumoconiosis. Admittedly, the ALJ's analysis of whether Mr. Goode's COPD arose out of coal mine employment is similar to the ALJ's analysis of whether Mr. Goode's totally disabling respiratory impairment was significantly related to, or substantially caused by, his legal or clinical pneumoconiosis. But the analyses are not identical.

In any event, in this disability causation section, the ALJ discredited the opinions of American Energy's physicians that only smoking caused Mr. Goode's COPD because they failed to consider the possible additive effects of smoking and coal dust exposure. He also reasoned that American Energy's physicians did not explain why certain medical evidence was attributable to smoking rather than both coal dust and smoking, nor did they consider Mr. Goode's specific role as a coal rock driller. Conversely, the ALJ reiterated that he was crediting the opinions of Mrs. Goode's physicians who concluded that both smoking and coal dust exposure caused Mr. Goode's COPD because those opinions were consistent with the preamble. The ALJ specifically credited Dr. Perper's statement that the respective contributions of coal dust exposure and smoking to a miner's COPD cannot be assessed unless either the smoking or coal dust exposure contribution is minimal "because the symptomatology, pulmonary dysfunction and pathology are virtually identical." J.A. 128. In addition to recognizing the potential additive effects of smoking and coal dust, the ALJ

13

also noted that Dr. Perper examined Mr. Goode's lung tissue, found that Mr. Goode had silicosis, a type of clinical pneumoconiosis that "is a more severe clinical entity," and considered Mr. Goode's role as a coal rock driller. J.A. 128. The ALJ further found that Dr. Perper's opinion was supported by the opinions of Mrs. Goode's other physicians. Thus, the ALJ concluded that Mrs. Goode established disability causation.

Having found that Mrs. Goode carried her burden of establishing all four elements by a preponderance of the evidence, the ALJ determined that Mr. Goode had been entitled to black lung benefits. He, therefore, awarded benefits to Mrs. Goode.

American Energy appealed the ALJ's decision to the Department's Benefits Review Board. American Energy argued that the ALJ erred in concluding that Mrs. Goode established both legal pneumoconiosis and disability causation. Chief among American Energy's arguments were that the ALJ improperly discredited its physicians' opinions as inconsistent with the preamble and erroneously conflated the issues of legal pneumoconiosis and disability causation.

The Board denied American Energy's appeal. It affirmed the ALJ's decision to credit Dr. Perper's opinion and reject the opinions of American Energy's physicians, explaining that ALJs "may consult the preamble in determining the credibility of a medical opinion and reject opinions that are inconsistent with [its] medical and scientific premises." J.A. 56. The Board ultimately concluded that substantial evidence—Dr. Perper's opinion—supported the ALJ's legal pneumoconiosis finding. The Board also disagreed with American Energy's contention that the ALJ improperly conflated the issues of legal pneumoconiosis and disability causation. The Board explained that "the only issue in this

14

case is the etiology of [Mr. Goode]'s disabling COPD and whether it constitutes legal pneumoconiosis." J.A. 57. Because the ALJ "permissibly credited Dr. Perper's opinion that [Mr. Goode]'s disabling COPD constitute[d] legal pneumoconiosis," the Board affirmed his disability causation finding. J.A. 58. The Board did not, however, consider the ALJ's clinical pneumoconiosis findings that also formed the basis of his award of benefits.

After unsuccessfully moving for reconsideration en banc of the Board's decision, American Energy timely petitioned for our review of the Board's black lung benefits award.[5]

## III.

American Energy raises two primary issues in its petition. First, American Energy argues that the ALJ applied the wrong standard to find legal pneumoconiosis. Second, American Energy argues that the ALJ erroneously conflated the issues of legal pneumoconiosis and disability causation. Our focus is on the first issue, which we find dispositive.

## A.

In black lung cases, our review of the Board's order "is governed by the same standard the Board applies when reviewing an ALJ's decision." *Boyd & Stevenson Coal Co. v. Dir., OWCP*, 407 F.3d 663, 666 (4th Cir. 2005). "We review the findings of the ALJ, as affirmed by the [Board], to determine [if they] are supported by substantial evidence and

---

[5] We have jurisdiction over American Energy's petition for review under 33 U.S.C. § 921(c), as incorporated by 30 U.S.C. § 932(a).

in accordance with the law." *Richardson v. Dir., OWCP*, 94 F.3d 164, 167 (4th Cir. 1996) (internal quotations omitted). We will not disturb an ALJ's factual finding, "even if we disagree with it, provided the determination is supported by substantial evidence." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). We review de novo the legal conclusions of the Board and ALJ. *Boyd & Stevenson Coal Co.*, 407 F.3d at 666.

B.

In insisting that the ALJ applied an incorrect legal standard in finding legal pneumoconiosis, American Energy frames two arguments.[6] First, American Energy contends that in rejecting the legal pneumoconiosis opinions of American Energy's physicians as inconsistent with the preamble, the ALJ shifted the burden of proof from

---

[6] American Energy also argues that the ALJ did not consider all relevant evidence when determining that Mr. Goode had a 57 pack-year smoking history. We disagree. The ALJ cited the very exhibits that American Energy contends were not considered. To the extent that American Energy maintains that these citations are insufficient to satisfy the ALJ's duty under the Administrative Procedure Act, there is no requirement than an ALJ specifically refer to every piece of evidence in the record. Rather, an ALJ satisfies his duty of explanation when he makes clear "what [he] did and why he did it." *Lane Hollow Coal Co. v. Dir., OWCP*, 137 F.3d 799, 803 (4th Cir. 1998). The ALJ's explanation underlying his smoking history finding, which was supported by substantial evidence, does just that.

In addition, American Energy takes issue with the ALJ crediting the opinions of three of Mrs. Goode's physician experts who relied on incorrect coal mine employment histories. Though the ALJ determined Mr. Goode to have a coal mine employment history of 12.61 years, the three physicians credited Mr. Goode with 24 years of coal mine employment. But we need not reach the issue of the ALJ's reliance on these opinions, as it makes no difference to our analysis of the ALJ's legal pneumoconiosis finding. As our analysis explains, the ALJ's legal pneumoconiosis finding stemmed from his use of an improper legal standard.

16

Mrs. Goode to American Energy. Recall that the ALJ found that American Energy's expert physicians' opinions that smoking, not coal dust, caused Mr. Goode's COPD were inconsistent with the preamble. The ALJ explained that those physicians failed to explain why coal dust was not a factor in Mr. Goode's pulmonary impairment. According to American Energy, this gets the burden of proof backwards. The Act and its regulations require Mrs. Goode to prove that Mr. Goode's lung disease arose out of coal dust exposure; they do not require American Energy to prove that coal dust exposure did not give rise to Mr. Goode's lung disease.

Second, and relatedly, American Energy argues that the ALJ improperly credited Dr. Perper's legal pneumoconiosis opinion as consistent with the preamble, particularly where Dr. Perper could not determine from the evidence the respective contributions of coal dust exposure and smoking to Mr. Goode's COPD. While framed as a separate argument, this really is a corollary of its first argument. American Energy here argues that Mrs. Goode has not met her burden of proof if her evidence is equally applicable to smoking and coal dust.

Since American Energy's arguments are really two sides of the same coin, we consider them together. We have repeatedly held that an ALJ is permitted to consult the preamble when determining whether to credit a physician's medical opinion on the existence of pneumoconiosis or the cause of a miner's disabling respiratory impairment. *See Westmoreland Coal Co. v. Stallard*, 876 F.3d 663, 667 (4th Cir. 2017); *Harman Min. Co. v. Dir., OWCP*, 678 F.3d 305, 314–15 (4th Cir. 2012). That is, an ALJ does not apply an incorrect legal standard by discrediting medical opinions that are inconsistent with the

17

medical and scientific premises relied upon by the Department in the preamble. *See Harman Min. Co.*, 678 F.3d at 314–15. For instance, in *Harman*, the ALJ rejected an expert's legal pneumoconiosis opinion because, among other reasons, it was based on a belief that was inconsistent with the preamble. *Id.* at 313. The expert had opined that the miner did not have legal pneumoconiosis because x-ray, CT scan and pathological evidence revealed clinically insignificant coal dust retention in his lungs. *Id.* at 312. The ALJ explained that this opinion "indicated that [the expert] believed that 'coal dust induced obstructive lung disease is insignificant where the miner does not suffer from clinically significant pneumoconiosis, i.e., pneumoconiosis [discernible] by chest x-ray, CT scan, or pathology.'" *Id.* at 313. The ALJ found this belief inconsistent with the preamble's express recognition that coal dust can induce obstructive pulmonary disease even in the absence of clinically significant pneumoconiosis. *Id.* (citing Fed. Reg. at 79,938–40). On appeal, in addition to noting the ALJ's "very limited" reliance on the preamble, we concluded that the ALJ was entitled to consider the preamble when assessing the credibility of the expert's opinion. *Id.* at 314–15.

But the principle that an ALJ may discredit an expert's opinion as inconsistent with the preamble only applies if the opinion is, in fact, inconsistent with the preamble. For example, it is actually inconsistent with the preamble to conclude that a miner does not have legal pneumoconiosis because x-ray, CT scan and pathological evidence does not reveal clinically significant pneumoconiosis. The reason it is inconsistent is because the preamble specifically says the exact opposite; it says that coal dust can cause lung disease even without clinically significant pneumoconiosis. *See* 65 Fed. Reg. at 79,938–40. In fact,

18

that is the basis of our holding in *Harman*. *See* 678 F.3d at 313. But, as American Energy points out, concluding that the record evidence indicates that a miner's lung disease was caused by smoking rather than coal dust is not inconsistent with the preamble. The preamble simply says that a history of smoking does not foreclose a conclusion that coal dust caused or contributed to a miner's lung disease. It does not say that a history of both coal dust exposure and smoking forecloses a conclusion that smoking, and not coal dust exposure, caused a miner's lung disease.

Here, the ALJ discredited the legal pneumoconiosis opinions of American Energy's physicians that smoking alone caused Mr. Goode's respiratory impairment as inconsistent with the preamble. According to the ALJ, American Energy's physicians failed to adequately explain why coal dust exposure was not also a cause of Mr. Goode's respiratory impairment. But the Act and its implementing regulations place the burden of proving pneumoconiosis on the miner, not the employer. So, American Energy has no burden to prove that coal dust exposure *did not* cause Mr. Goode's respiratory impairment—it is Mrs. Goode who has the burden to prove that coal dust exposure *did* cause it. It was, therefore, improper for the ALJ to require American Energy's physicians to explain why coal dust exposure was not a cause of Mr. Goode's impairment.

Relatedly, an ALJ must not credit a physician's legal pneumoconiosis opinion as consistent with the preamble merely because it identifies coal dust exposure and smoking as dual causes of a miner's respiratory impairment. Yet, that is precisely what the ALJ did. Based on the preamble's recognition that "[s]mokers who mine have additive risk for developing significant obstruction," the ALJ credited the legal pneumoconiosis opinions

19

of Mrs. Goode's experts as consistent with the preamble simply because they recognized both coal dust exposure and smoking as causes of Mr. Goode's COPD. J.A. 125 (quoting 65 Fed. Reg. at 79,940). The ALJ gave no other reason for his legal pneumoconiosis conclusion.

Under the ALJ's approach, every medical opinion identifying coal dust exposure and smoking as dual causes of a miner's respiratory impairment would be credited as being consistent with the preamble—even if those opinions are not supported by actual evidence that the miner's impairment is more consistent with exposure to coal dust than smoking—while every medical opinion that fails to identify coal dust exposure as a cause would be automatically discredited.[7] Proving our point, Dr. Perper conceded "that the symptomatology, pulmonary dysfunction[,] and pathology [of COPD caused by smoking versus COPD caused by coal dust exposure] are virtually identical." J.A. 124. That means he could not tell from this medical evidence whether Mr. Goode's impairment was caused

---

[7] The dissent stresses that we must defer to the credibility determinations made by the ALJ in his role as factfinder. Dissent at 35–36 ("[T]he ALJ is the trier of fact, [and] we defer to the ALJ's evaluation of the proper weight to accord conflicting medical opinions." (quoting *Harman Min. Co.*, 678 F.3d at 310)). True, an ALJ's credibility determinations are entitled to deference. But that deference is not unlimited. An ALJ's factual findings, including the weight assigned to medical opinions, must be supported by substantial evidence to warrant our deference. *Harman Min. Co.*, 678 F.3d at 310 ("Because the ALJ is the trier of fact, we defer to the ALJ's evaluation of the proper weight to accord conflicting medical opinions. *As long as substantial evidence supports an ALJ's findings*, we must sustain the ALJ's decision, even if we disagree with it." (emphasis added) (internal citations and quotations omitted)); *W. Va. CWP Fund ex rel. Pen Coal Corp. v. Mullins*, 623 F. App'x 59, 61 (4th Cir. 2015) ("Although we may not reweigh the medical opinions, we may determine whether the weight assigned by the ALJ is supported by substantial evidence . . . ."). When the sole basis for an ALJ's credibility determination is a nonexistent inconsistency with the preamble, no such substantial evidence exists.

by smoking, coal dust exposure or both. When the evidence does not point to coal dust exposure any more than it points to smoking, crediting opinions that coal dust partially caused a miner's lung disease as being consistent with the preamble relieves a miner of his burden of proof. Such an approach, in effect, flips the preponderance of the evidence burden governing a miner's claim from the miner to the employer.

Of course, the ALJ could have permissibly found the legal pneumoconiosis opinions of American Energy's physicians to be less *persuasive* than those of Mrs. Goode's physicians for any number of reasons, including less thorough analyses of the potential causes of Mr. Goode's respiratory impairment. Similarly, the ALJ could have found the opinions of Dr. Perper and/or Mrs. Goode's other physicians more *persuasive* than the opinions of American Energy's physicians. And to be sure, in the legal pneumoconiosis analysis, the ALJ purported to find the opinions of American Energy's physicians less persuasive than those of Mrs. Goode's physicians because they did not adequately explain why they ruled out coal dust exposure as a cause. But, in that same analysis, the only reason that the ALJ gave for finding American Energy's physicians' legal pneumoconiosis opinions less persuasive was that they were "inconsistent with the preamble" due to their conclusion that coal dust exposure was not a cause of Mr. Goode's respiratory impairment. Similarly, the only reason the ALJ gave for finding Mrs. Goode's experts' legal pneumoconiosis opinions more persuasive was that they were consistent with the preamble because they attributed Mr. Goode's impairment to both smoking and coal dust. And the ALJ found this despite Dr. Perper's concession—which the ALJ also credited—that whether Mr. Goode's COPD was caused by smoking, coal dust or both, his

21

symptomatology, pulmonary function and pathology would be virtually identical. That is, this medical evidence did not point to coal dust exposure any more than it did to smoking. So, considering the legal pneumoconiosis analysis in total, the ALJ effectively read the preamble's language to create a presumption that coal dust is at least one cause of Mr. Goode's lung disease since, in addition to being a heavy smoker, Mr. Goode worked in coal mines. Said differently, the ALJ's construction of the preamble effectively flipped the burden of proof to American Energy on an essential element of Mrs. Goode's claim.[8]

To be fair, in other parts of the opinion, the ALJ appears to credit Dr. Perper's opinion for reasons beyond his misinterpretation of the preamble. While discussing the disability causation element (not the legal pneumoconiosis element), the ALJ first credited Dr. Perper's opinion—along with the same opinions of Mrs. Goode's other physicians— that Mr. Goode's COPD was caused by smoking and coal dust because finding those dual causes was consistent with the preamble. As already discussed, this was improper. But the ALJ also recognized Dr. Perper's reliance on Mr. Goode having over 12 years of coal dust exposure, not just in coal mines generally but specifically working as a "driller" and "roof bolter," which exposed him to "increased amounts of airborne coal rock dust." J.A. 128. And recognizing that Dr. Perper was the only opining physician to examine Mr. Goode's

---

[8] According to the dissent, we are narrowing principles of black lung jurisprudence by concluding that "an ALJ can only use the preamble to discredit an expert opinion if the opinion is, in fact, inconsistent with the preamble." Dissent at 30 (internal quotations omitted). But that is not our holding. Our jurisprudence allows ALJs to consult the preamble when making credibility determinations, and nothing in our opinion narrows their ability to do so. But, as we clarify today, "an ALJ can only use the preamble to discredit an expert opinion" *as inconsistent with the preamble* "if the opinion is, in fact, inconsistent with the preamble."

22

lung tissue, the ALJ afforded "great weight" to Dr. Perper's finding that Mr. Goode had silicosis, a severe form of clinical pneumoconiosis that is more prevalent in coal miners who, like Mr. Goode, worked in positions exposing them to increased amounts of airborne coal dust. J.A. 128. Dr. Perper also recognized that Mr. Goode had a specific type of COPD—centrilobular emphysema—that studies have linked to coal dust exposure.

Unlike the evidence discussed in the ALJ's legal pneumoconiosis analysis, this additional evidence is not neutral between smoking and coal dust. It points to coal dust. Had the ALJ applied the proper burden of proof in his legal pneumoconiosis analysis when considering the physicians' opinions, this part of the ALJ's decision might very well have justified denying American Energy's petition.[9] But the ALJ's *proper* legal analysis on the disability causation element does not allow us to look past the ALJ's legal error of construing the preamble to effectively flip the burden of proof to American Energy on the legal pneumoconiosis element. While agency action is subject to harmless error review, *Sea "B" Min. Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016), a legal error is only harmless in a black lung case "if the outcome . . . is foreordained," *Sahara Coal Co. v. Dir., OWCP*, 946 F.2d 554, 558 (7th Cir. 1991). Here, it is certainly possible, maybe even probable, that the ALJ would have reached the same conclusion had he not misinterpreted the preamble. But we cannot be sure. The ALJ's legal error, therefore, fatally undermines his award of benefits based on legal pneumoconiosis.

---

[9] After all, we have already recognized that the legal pneumoconiosis and disability causation elements are intertwined where a miner's legal pneumoconiosis is his total disability.

23

However, the ALJ's award of benefits was based on more than his legally defunct finding of legal pneumoconiosis. It was also based on his findings pertaining to clinical pneumoconiosis.

## C.

With respect to clinical pneumoconiosis, American Energy stipulated that Mrs. Goode satisfied the first three elements of her claim for benefits, and those stipulations were supported by substantial evidence in the record. The ALJ determined that Mrs. Goode had also proven the fourth element, disability causation. Relevant to that determination, each opining physician recognized Mr. Goode's COPD as totally disabling, and none identified any other condition that totally disabled him. So, to satisfy the fourth element, Mrs. Goode had to show that Mr. Goode's clinical pneumoconiosis arising out of coal mine employment substantially contributed to his totally disabling COPD.

As already discussed, in his causation analysis, the ALJ noted that Dr. Perper acknowledged some medical evidence did not reveal whether coal dust or smoking caused Mr. Goode's lung disease. And beyond the evidence the ALJ mentioned, Dr. Perper recognized that Mr. Goode's pulmonary function did not improve with bronchodilators, a treatment known to improve pulmonary function in those with smoking-related respiratory impairments. Finally, the ALJ found that, in the face of this and other evidence, American Energy's experts did not persuasively explain why coal dust had no part in causing Mr. Goode's lung disease. This evidence sufficiently supports the ALJ's express finding that Mr. Goode's clinical pneumoconiosis was a substantially contributing cause of his total disability.

24

So, while the ALJ's legal pneumoconiosis findings cannot support the award of benefits due to the application of an improper legal standard, the ALJ's clinical pneumoconiosis findings—which are not infected by the legal error—can. However, the Board did not consider clinical pneumoconiosis as a basis for affirming the ALJ's award of benefits. And under our precedent, in black lung cases, "[a]ffirming the Board's [decision] on an alternative ground not actually relied upon by the Board is prohibited under the *Chenery* doctrine." *Island Creek Coal Co. v. Henline*, 456 F.3d 421, 426 (4th Cir. 2006); *see also Gulf & W. Indus. v. Ling*, 176 F.3d 226 (4th Cir. 1999) (explaining that, under *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), "we look exclusively to the grounds relied upon by the [Board]"). So, we are unable to deny American Energy's petition based on the ALJ's clinical pneumoconiosis conclusion.

While our precedent constrains us, we wonder whether *Henline*'s and *Ling*'s application of *Chenery* makes sense here. For most agency cases, it does. After all, we normally review the final agency decision. But in black lung cases, our standard of review is different. We effectively stand in the Board's shoes reviewing the ALJ's decision. *Richardson*, 94 F.3d at 167 ("We review the findings of the ALJ, as affirmed by the [Board], to determine [if they] are supported by substantial evidence and in accordance with the law."). For that reason, several circuits have affirmed orders of the Board on alternative grounds. *See Crockett Colleries, Inc. v. Barrett*, 478 F.3d 350, 356–57 (6th Cir. 2007); *Lauderdale v. Dir., OWCP*, 940 F.2d 618, 622 (11th Cir. 1991); *Todd Shipyards Corp. v. Dir., OWCP*, 848 F.2d 125, 127 n.3 (9th Cir. 1988); *United Brands Co. v. Melson*, 594 F.2d 1068, 1072 n.10 (5th Cir. 1979), *superseded on other grounds by* 33 U.S.C. §

25

903(e). As explained in a Sixth Circuit concurrence, "[t]he *Chenery* doctrine rests on the understanding that agency orders involve a determination of policy or judgment which the agency alone is authorized to make. . . . But, the [Board] functions exclusively as a quasi-judicial, rather than as a policy making, body." *Barrett*, 478 F.3d at 358 (Rogers, J. concurring) (internal citations and quotations omitted). Indeed, the Board essentially stands in the place of a district court when it reviews an ALJ's factual findings for substantial evidence and legal conclusions de novo—the same standards we apply when we review the Board's orders. Given we are empowered "to do exactly the same thing (and the only thing) that the [Board] is empowered to do," the Board "does not possess any unique authority to make the kinds of judgments it is authorized to make." *Id.*

We cannot, however, overrule a prior three-judge panel's decision. *See McMellon v. United States*, 387 F.3d 329, 334 (4th Cir. 2004) (en banc). So, we need not resolve our concerns about our precedent's application of the *Chenery* doctrine to our review of the Board's orders. Instead, we must grant American Energy's petition and vacate and remand the Board's order.

## IV.

For these reasons, we grant American Energy's petition for review and vacate and remand the Board's order awarding black lung benefits for proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED; ORDER VACATED AND REMANDED*

26

DEANDREA GIST BENJAMIN, Circuit Judge, dissenting:

I disagree with the majority's holding that the ALJ "require[d] American Energy's physicians to explain why coal dust exposure was not a cause of Mr. Goode's impairment." Maj. Op. at 19. In my view, the ALJ was within his discretion to credit Dr. Perper's opinion and applied the correct burden of proof to Mrs. Goode's claim. I believe substantial evidence supports a finding of legal pneumoconiosis and would end the analysis there. Therefore, I respectfully dissent.

The majority opinion misconstrues an ALJ's role in resolving Black Lung disputes by conflating the ALJ's role as factfinder with the standard necessary to prevail under the Black Lung Benefits Act (BLBA). As a result, the majority creates a new, narrowed approach to the statutory framework that is at odds with well-accepted circuit precedent. I begin with a review of the relevant provisions before explaining why I believe the majority's holding is incompatible with our precedent.

I.

To be entitled to relief under a legal pneumoconiosis theory, Mrs. Goode "must [] show that [her husband's] lung disease . . . arose out of coal mine employment. To arise out of coal mine employment means to be 'significantly related to, or substantially aggravated by,' coal dust exposure in coal mine employment." Maj. Op. at 5 (quoting 20 C.F.R. § 718.201(b)). She must also show that her husband had "a totally disabling respiratory or pulmonary impairment." *Id.* Although American Energy has conceded that Mr. Goode was totally disabled, the parties dispute whether that disability was caused by

27

coal mining. *Id.* at 10. So, Mrs. Goode must prove that legal pneumoconiosis exists, and show that her husband's disability was caused by the legal pneumoconiosis. *See id.* at 7 ("[I]n cases where a miner's legal pneumoconiosis does not double as his totally disabling respiratory or pulmonary impairment, the miner must separately prove that his pneumoconiosis is a substantially contributing cause of that totally disabling . . . impairment.").

The majority agrees that the ALJ is entitled to find "the legal pneumoconiosis opinions of American Energy's physicians to be less *persuasive* than those of Mrs. Goode's physicians." *Id.* at 21. I believe that the ALJ did just that—I part with the majority in my understanding of what the ALJ did when evaluating the claim before it.

A discussion of the preamble to the BLBA is warranted before I move on. In 2000, the Department of Labor amended the regulation and added "legal pneumoconiosis" to the definition of pneumoconiosis. The preamble to the BLBA helps explain why it chose to do so. *See Blue Mountain Energy v. DOWCP*, 805 F.3d 1254, 1261 (10th Cir. 2015). The preamble reviews scientific studies and makes conclusions relevant to the legal assessment of pneumoconiosis and causation. For example, it states that "[e]ven in the absence of smoking, coal mine dust exposure is clearly associated with clinically significant airways obstruction and chronic bronchitis. The risk is additive with cigarette smoking." 65 Fed. Reg. 79920, 79940. The preamble clearly adopts the view that a single impairment can be caused by both smoking and coal mining, or either of the two. *See id.* at 79939 ("Lung function . . . decline [occurs] in relation to increasing underground dust exposure . . . *This decline occurs at a similar rate in smokers and nonsmokers.*" (emphasis added)); *id* ("Most

28

evidence to date indicates that exposure to coal mine dust can cause chronic airflow limitation . . . The relationships between [pulmonary diseases] on the one hand and environmental factor of coal exposure on the other *appear to be similar to those found for cigarette smoking*.") (emphasis added). In other words, a pulmonary impairment in a chronic smoker does not foreclose the possibility that the impairment was caused by coal mining exposure.

### A.

With this context in mind, I begin with the ALJ's credibility determination in this case. The majority repeatedly states that "the ALJ concluded that American Energy's physicians *failed* to adequately explain why Mr. Goode's coal dust exposure was also not a factor in his obstructive respiratory impairment." Maj. Op. at 11. (emphasis added) (internal quotation marks omitted); *see also id.* at 13, 17, 19 (stating that the ALJ concluded that American Energy "failed" to explain why coal dust did not contribute to Mr. Goode's impairment). In my view, that is an inaccurate reading of the ALJ's order. Had the ALJ stated that American Energy "failed" to explain away the preamble, I would agree that he placed an impermissible burden on the employer. But a complete reading of the order reveals he imposed no such requirement. He merely stated that American Energy's experts' "opinions are . . . inconsistent with the Preamble. Accordingly, *little weight is accorded to the[ir] opinions* . . . because they did not adequately explain why all of the Miner's obstructive respiratory impairment was due to cigarette smoking and none to his coal dust exposure." J.A. 125 (emphasis added). The ALJ's discussion reflects the kind

29

of language expected to accompany a credibility determination. He simply found the "opinions of American Energy's physicians to be less *persuasive*." Maj. Op. at 21.

Our circuit precedent makes clear that this kind of decision is well within the ALJ's discretion. "[I]t is for the ALJ, as trier of fact, to make factual and credibility determinations . . . and we therefore defer to the ALJ's evaluation of the proper weight to accord conflicting medical opinions." *Hobet Mining, LLC v. Epling*, 783 F.3d 498, 504 (4th Cir. 2015) (internal quotation marks omitted). Consideration of the preamble in a credibility determination is also squarely within the bounds of our precedent. In *Harman Mining*, a mining employer attacked the ALJ's invocation of the preamble in its credibility determination. *Harman Mining Co. v. DOWCP*, 678 F.3d 305, 313 (4th Cir. 2012). It argued that "the ALJ violated the APA by finding [the expert physician's] opinion to be less credible because his views conflicted with . . . the preamble." *Id.* at 314. The panel rejected that contention; it concluded that "[w]e can find no support for this argument. Although the ALJ did not need to look to the preamble in assessing the credibility of [the discredited expert's] views, we conclude that the ALJ was entitled to do so." *Id*. at 314–15.

## B.

Today, the majority attempts to narrow these well-respected principles. Under its reading of Black Lung jurisprudence, an ALJ can only use the preamble to discredit an expert opinion if the "opinion is, in fact, inconsistent with the preamble." Maj. Op. at 18. "Relatedly, an ALJ must not credit a physician's legal pneumoconiosis opinion as consistent with the preamble merely because it identifies coal dust exposure and smoking

as dual causes of a miner's respiratory impairment." *Id.* at 19.  My issues with this statement are twofold.  First, it misunderstands the ALJ's conduct.  Second, the majority's newfound principles substantially limit the broad discretion an ALJ enjoys in his or her role as factfinder.  The majority cites to no authority to justify this limitation, and my review of circuit caselaw does not reveal any like limitation.  *See, e.g.*, *Helen Min. Co. v. DOWCP*, 650 F.3d 248, 257 (3rd Cir. 2011) ("The ALJ's reference to the preamble to the regulations . . . unquestionably supports the reasonableness of his decision to assign less weight to [an expert's] opinion.");  *A&E Coal Co. v. Adams*, 694 F.3d 798, 801–02 (6th Cir. 2012) (finding no error in looking to the preamble to assess the doctor's credibility);  *Blue Mountain Energy*, 805 F.3d at 1261–62 (the preamble "seems like a reasonable and useful tool for ALJs to use in evaluating the credibility of the science underlying expert reports that address the cause of pneumoconiosis.  Accordingly, we join our sister circuits in holding that an ALJ may—*but* need not—rely on the preamble").  There is no prerequisite analysis necessary to unlock the authority to consider the preamble.

The facts of this case illustrate why such limiting principles are ill-suited.  The majority decided that the ALJ discredited American Energy's experts because the experts did not "explain why coal dust exposure was not a cause of Mr. Goode's impairment."  Maj. Op. at 19.  But that conclusion overlooks the context before the ALJ.  Mr. Goode had a significant smoking history *and* a significant (though less than 15 years) coal mining history.  The parties agreed that Mr. Goode was fully disabled due to an impairment, and Mrs. Goode argued that the impairment in question was legal pneumoconiosis.  The issues

31

before the ALJ therefore rested on one determination: was the impairment caused by cigarette smoking or caused by coal mining?

American Energy's experts unsurprisingly opined that cigarette smoking was the cause of Mr. Goode's impairment, and each expert gave minimal (if any) explanation on why the cause could not be coal mining, or rather, why it could only be smoking. *See e.g.*, J.A. 968 (Dr. Fino stating simply that "all could be explained by cigarette smoking," and that Mr. Goode's symptoms "point to a smoking-related abnormality," so "coal mine dust as contributing to, or causing, [Mr. Goode's] pulmonary disability" is ruled out.); J.A. 829 (Dr. Sargent stating that "[b]oth coal mining and cigarette smoking can result in an obstructive ventilatory impairment, however, the causation of the obstructive impairment in individuals who are exposed to both is generally distinguishable based on objective criteria," and concluding "Mr. Goode is not suffering from legal pneumoconiosis"); J.A. 946, (Dr. McSharry concluding that he "is certain . . . [Mr. Goode] suffers from tobacco-related obstructive lung disease," but also stating that "[i]t is extremely difficult to determine" whether the impairment is "related to coal dust exposure," because "how could symptoms related to that disorder be identified amidst the severe impairing abnormalities caused by" cigarettes?).  None of American Energy's experts addressed the principles the preamble adopted.

In contrast, Mrs. Goode's medical expert—Dr. Perper[1]—predictably found that Mr. Goode had legal pneumoconiosis.  Dr. Perper's comprehensive report squarely addressed

---

[1] Mrs. Goode presented multiple medical experts to the ALJ.  I focus on Dr. Perper because he is the expert the ALJ exclusively relied on to grant benefits.

the principles the preamble adopted and rebutted American Energy's experts' opinions by noting, as the preamble affirms, that the presence of smoking does not exclude coal exposure as a cause of impairment. J.A. 691–93. ("[T]wo consultants again argued that based on [Mr. Goode's physical symptoms], the COPD/emphysema is solely related to smoking, but conveniently forgot to mention that the failure to improve significantly with bronchodilators supported a coal dust etiology."). His medical opinion further explained why Mr. Goode's impairment was caused by coal mining despite his many years of smoking cigarettes.

In this context, the ALJ was certainly authorized to consider the preamble when making his credibility determination. Where one side's experts address the principles the preamble adopts, and the other side's experts argue their position despite the preamble's principles, I see no reason why an ALJ should be prohibited from finding an opinion in line with the preamble more credible than one at odds with its principles.[2]

\*          \*          \*

I "view the preamble as a scientific primer that helps explain why the agency amended the regulation to add 'legal pneumoconiosis' to the definition of 'pneumoconiosis.'" *Blue Mountain Energy*, 805 F.3d at 1261. *See also Peabody Coal Co. v. DOWCP*, 746 F.3d 1119, 1125 (9th Cir. 2014) ("A preamble may be used to give an ALJ understanding of a scientific or medical issue."). Accordingly, where, as here, the

---

[2] Although I disagree with the majority's contention that an ALJ is only permitted to credit an expert's opinion under the preamble after verifying that an expert's opinion is in fact consistent, I note here that Dr. Perper's medical report clearly meets that standard.

33

parties are arguing over the existence of *legal* pneumoconiosis, an ALJ is entitled to use the preamble as a scientific primer. And when the preamble speaks to alternative causation theories that are both present in a case before an ALJ, the ALJ may very well discredit an expert's opinion for failing to address both theories, especially when the opposing expert's opinion does. Here, American Energy's experts did not explain why the coal dust (that is a known contributor to pneumoconiosis) was not a cause of Mr. Goode's impairment, and Dr. Perper explained why he believed coal mining was *the* cause and why he believed smoking was merely a factor.

Our sister circuits' caselaw—and up until today, our own precedent—has been consistent: In every case where a BLBA employer challenges the use of the preamble in a credibility determination, courts hold that an ALJ may generally use the preamble to weigh conflicting opinions. The ALJ's actions fall squarely in line with that well-accepted principle. Therefore, the ALJ's choice to use the preamble to weigh evidence does not "remove [Mrs. Goode's] burden of proving causation. It merely permits ALJs to use the science described in the preamble to weigh the evidence that the parties offer to prove (or disprove) causation." *Blue Mountain Energy*, 805 F.3d at 1262.

## II.

Crediting an expert's opinion is not the end of the analysis, however. The ALJ must step out of its role as factfinder and rule that the expert's opinion independently meets the statutory burden of proof. "[A] miner must prove legal pneumoconiosis, along with total disability and disability causation, by a preponderance of the evidence." Maj. Op. at 8. In

34

other words, the credited expert's opinion must show that (1) Mr. Goode's impairment arises out of coal mine employment, *see* 20 C.F.R. § 718.201(a)(2); (2) his impairment prevents him from engaging in gainful employment or performing coal work, *see id.* at 718.204(b)(1); and (3) his impairment has a material adverse effect on his condition or materially worsens an unrelated impairment, *see id.* at 718.204(c)(1).

Dr. Perper's medical report satisfies the standard in each respect. He found that Mr. Goode had legal pneumoconiosis based on his "occupational exposure to airborne coal dust, particularly as a rock driller." J.A. 692. The autopsy revealed evidence that is "known to develop as a result of long standing exposure to coal dust." *Id.* Mr. Goode's smoking was also a "major cause" of his impairment, but his failure to improve after undergoing treatments that typically ameliorate symptoms in impairments caused by smoking is evidence that the cause of the disease is coal mining. *Id.* at 692–93. He also found that the impairment caused Mr. Goode's death. *Id.* at 693.

In short, Dr. Perper's extensive medical report, which we must defer to at this stage, provides support sufficient to carry Mrs. Goode's burden of proof. Accordingly, I agree with the ALJ and the Benefits Review Board in their determination that Mr. Goode's right to benefits under the BLBA has been established.

## III.

I conclude by retracing my steps to untangle the standards at issue here. The majority conflates the discretion an ALJ enjoys as factfinder with the standard of proof a claimant must show to prevail under the statute. Under the former, "the ALJ is the trier of

35

fact, [and] we defer to the ALJ's evaluation of the proper weight to accord conflicting medical opinions." *Harman Min. Co.*, 678 F.3d at 310 (internal quotation marks and citation omitted). If the claimant relies on a credited medical opinion to prevail under the Act, then the opinion must also "prove legal pneumoconiosis, along with total disability and disability causation, by a preponderance of the evidence." Maj. Op. at 8. But the two inquiries are independent analyses.

Therefore, the majority is correct when it states that "[t]he Act and its implementing regulations place the burden of proving pneumoconiosis on the miner, not the employer. So, American Energy has no burden [of proof]." Maj. Op. at 19. But the majority fails to acknowledge that the ALJ did not "require American Energy's physicians to explain why coal dust exposure was not a cause of Mr. Goode's impairment." *Id.* Instead, he simply found those experts less persuasive than other experts that acknowledged and addressed all the relevant possibilities. And, as section II of my dissent makes clear, the expert opinion the ALJ credited provides substantial evidence of legal pneumoconiosis and disability causation.

## IV.

I would deny the petition for review because the ALJ's analysis aligns with well-accepted standards in Black Lung jurisprudence and established Mr. Goode's right to benefits. Accordingly, I respectfully dissent.

36